IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ADRIANA DE LEON, § | |
| *Plaintiff,* § | |
| § | |
| vs. § | CIVIL ACTION NO. _____ |
| § | |
| SWIFT TRANSPORTATION § | |
| COMPANY OF ARIZONA, LLC, § | |
| AND BRADLEY E. DEMARCUS, § | |
| *Defendants.* § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Plaintiff, ADRIANA DE LEON, complaining of Swift Transportation Company of Arizona, LLC, and Bradley E. Demarcus, Defendants, and for cause of action shows unto the Court the following:

### I. PARTIES

1. Plaintiff, Adriana De Leon, is an individual citizen of the State of Texas.

2. Defendant, Swift Transportation Co. of Arizona, LLC, is an Arizona company doing business in the State of Texas. It may be served with process by serving its process agent, Douglas Fletcher, National Resident Agent Service, Inc., 9201 N. Central Expressway, Suite 600, Dallas, Texas 75231.

3. Defendant, Bradley E. Demarcus, is an individual citizen of the State of Louisiana. He may be served with process by certified mail, return receipt requested at the following address: 2080 Lobdell Boulevard, Baton Rouge, Louisiana, or in person wherever he may be found.

### II. JURISDICTION AND VENUE

4. This Court has diversity jurisdiction because the matter in controversy exceeds $75,000.00 and the case is between citizens of different states. 28 U.S.C. § 1332.

5. Venue is proper in the Western District of Texas, San Antonio Division, because a substantial part of the events and omissions giving rise to the claim occurred in New Bruaunfels, Comal County, Texas. *See* 28 U.S.C. § 1391(b)(2).

### III. FACTS

6. Defendant Swift Transportation Co. of Arizona, LLC, ("SWIFT") is a motor carrier licensed by the Federal Motor Carrier Safety Administration ("FMCSA").

7. In exchange for authority to operate 80,000-pound commercial motor vehicles on public roadways, SWIFT certified in writing and under oath to the FMCSA, that:

    A. it had in place a system for ensuring the overall compliance with the Federal Motor Carrier Safety Regulations ("FMCSR");

    B. it had a place a driver safety training/orientation program;

    C. it had in a system for overseeing driver qualification requirements;

    D. it had in place policies and procedures consistent with FMCSA regulations governing driving and operational safety of motor vehicles, including drivers' hours-of-service and vehicle inspection, repair, and maintenance; and

    E. it had in place a system for complying with the FMCSR governing alcohol and controlled substances testing requirements.

8. SWIFT knew that if it broke these promises it made to the FMCSA and if it failed to implement the safety management systems necessary to ensure compliance with the FMCSR(including the qualification of drivers) there would naturally and probably be preventable crashes resulting in injury and damage.

9. Despite this knowledge, SWIFT repeatedly broke its promises and violated the FMCSR.

10. The FMCSA conducted multiple audits and inspections of SWIFT that reveal numerous violations of the FMCSR by SWIFT.

11. In the *last two years alone*, roadside inspections of SWIFT's commercial motor vehicles recorded by the FMCSA have revealed that SWIFT's drivers have received:

   A. Four Hundred and Ninety-Nine (499) violations for speeding;

   B. Four Hundred and Seventy-Nine (479) violations for failing to obey traffic control devices;

   C. Three Hundred and Thirty-Four (334) Lane Restriction violations;

   D. Ninety-eight (98) violations for improper lane change and/or improper turn;

   E. Eighty-seven (87) violations for using a hand-held mobile telephone while operating a SWIFT commercial motor vehicle;

   F. Twenty-three (23) violations for inattentive driving; and

   G. Eleven (11) violations for failing to yield the right of way.

12. According to the FMCSA, in the *two years* before SWIFT caused the crash that injured Plaintiff, its drivers had been involved in at least 1,142 other crashes nationwide, including 32 fatalities.

13. At all times relevant to this lawsuit, Demarcus was acting within the course and scope of employment for SWIFT.

14. Upon information and belief, SWIFT violated the certified promises it made to the FMCSA in its application to operate commercial motor vehicles in the United States by failing to properly qualify Demarcus to drive and to train its driver, Demarcus.

15. Had SWIFT properly qualified Demarcus, the crash would not have occurred. That is, had SWIFT not qualified Demarcus to drive its tractor trailer, this crash would not have occurred.

16. Upon information and belief, SWIFT violated the certified promises it made to the FMCSA in its application to operate commercial motor vehicles in the United States by not adopting

and enforcing policies and procedures to ensure that its drivers operated vehicles in a safe manner.

17. SWIFT employs approximately 15,000 truck drivers.

18. Because of SWIFT'S poor treatment of its drivers, SWIFT has an annual driver turnover rate exceeding 90%. That is, SWIFT must hire approximately 13,500 new drivers every year.

19. Because of SWIFT's poor treatment of its drivers, SWIFT is unable to attract enough experienced, qualified drivers.

20. SWIFT is able to hire inexperienced, unqualified drivers because it is the majority owner of its liability insurance company. This majority ownership interest allows SWIFT to hire drivers that would be uninsurable by a standard liability insurance company.

21. SWIFT knowingly engages in a pattern of hiring tens of thousands of inexperienced drivers and putting these drivers on the road despite inadequate training, knowledge, and skill.

22. SWIFT knowingly pressures its instructors, trainers, and mentors to push through unqualified drivers so that it can replace the thousands of drivers who leave its employment each year due to poor working conditions.

23. The inadequacy of SWIFT's driver qualification and training program are so well known in the trucking industry, that SWIFT is said to stand for "Sure Wish I'd Finished Training."

24. SWIFT knew that its new drivers had a higher rate of crashes and incidents than experienced, qualified drivers.

25. SWIFT's vice-principals had actual, subjective awareness that the company's new driver

training program was inadequate, creating an extreme degree of risk, considering the probability and magnitude of the potential harm to the motoring public.

26. Despite SWIFT's vice-principals' actual, subjective knowledge of the extreme degree of risk created by its inadequate driver training and qualification program, SWIFT proceeded with conscious indifference to the rights, safety, and welfare of the motoring public by continuing to put unqualified, inadequately trained drivers behind the wheel.

27. SWIFT hired Demarcus, who was an inexperienced and unqualified driver.

28. SWIFT did not adequately train and qualify Demarcus before putting him behind the wheel of a tractor-trailer.

29. The industry standard for motor carriers is to prohibit tractor-trailer drivers from making unprotected u-turns.

30. The industry standard for motor carriers is to ensure, through training and monitoring, that their drivers know that unprotected u-turns are dangerous and forbidden.

31. SWIFT's vice-principals had actual, subjective awareness that a driver making an unprotected u-turn on a public roadway created an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

32. SWIFT's actual, subjective knowledge of the extreme degree of risk involved with unprotected u-turns came, in part, from the numerous crashes SWIFT drivers have had in the past, when attempting unprotected u-turns.

33. SWIFT's actual, subjective knowledge of the extreme degree of risk involved in unprotected u-turns came, in part, from its knowledge of other carriers' drivers causing crashes when making unprotected u-turns.

34. Despite SWIFT's actual, subjective knowledge of the extreme degree of risk associated with unprotected u-turns, SWIFT acted with conscious indifference to the rights, safety, and welfare of others by putting drivers (including Demarcus) behind the wheel without ensuring that the drivers understood why unprotected u-turns were dangerous and understood that unprotected u-turns were prohibited.

35. The industry standard for motor carriers is to ensure that their drivers know never to turn in front of oncoming traffic if doing so will require oncoming vehicles to stop or swerve to avoid a collision. This industry standard is set out in the model Commercial Driver License Manual, each state's commercial driver license manual, the United States Department of Transportation's Preventable Accident Manual, and numerous other publications.

36. Because of their length, tractor-trailers take more time than passenger vehicles to clear an intersection in a turn.

37. It is well known in the trucking industry that making a left turn or u-turn when there is an oncoming vehicle that would have to stop or swerve to avoid a collision creates an extreme degree of risk to the rights, safety, and welfare of the occupants of the oncoming vehicle.

38. SWIFT's vice-principals had actual, subjective knowledge of the extreme degree of risk associated with making a left turn or u-turn when there is an oncoming vehicle that would have to stop or swerve to avoid a collision.

39. Despite SWIFT's actual, subjective knowledge of the extreme degree of risk associated with unprotected u-turns, SWIFT acted with conscious indifference to the rights, safety, and welfare of others by putting drivers (including Demarcus) behind the wheel without ensuring that the drivers understood the dangers or making a left turn or u-turn when there is an oncoming vehicle that would have to stop or swerve to avoid a collision.

40. Despite SWIFT's actual, subjective knowledge of the extreme degree of risk associated with unprotected u-turns, SWIFT acted with conscious indifference to the rights, safety, and welfare of others by failing to ensure that SWIFT's drivers (including Demarcus) knew to never make a left turn or u-turn when there is an oncoming vehicle that would have to stop or swerve to avoid a collision.

41. The industry standard for motor carriers is to ensure that drivers have the knowledge and skills needed to scan the road ahead, see oncoming vehicles and other potential hazards, and to avoid turning in front of oncoming vehicles if doing so will require the other vehicle to swerve or brake to avoid a collision.

42. SWIFT's vice-principals had actual, subjective knowledge of the extreme degree of risk associated with a driver who lacks the knowledge and skills needed to scan the road ahead, see oncoming vehicles and other potential hazards, and to avoid turning in front of oncoming vehicles if doing so will require the other vehicle to swerve or brake to avoid a collision.

43. Despite SWIFT's actual, subjective knowledge of the extreme degree of risk associated with drivers who lack the required knowledge and skills, SWIFT acted with conscious indifference to the rights, safety, and welfare of others by failing to ensure that SWIFT's drivers (including Demarcus) had the knowledge and skills needed to scan the road ahead, see oncoming vehicles and other potential hazards, and to avoid turning in front of oncoming vehicles if doing so will require the other vehicle to swerve or brake to avoid a collision.

44. The industry standard for motor carriers for dispatchers to assist drivers with route planning so that drivers know where they need to turn.

45. The industry standard for motor carriers is to ensure that drivers have skills in route planning, and that drivers work with their dispatchers to plan routes and know where they need to turn.

46. SWIFT violated industry standards and was negligent in failing to ensure that drivers (including Demarcus) had the necessary route planning skills.

47. SWIFT violated industry standards and was negligent in failing to ensure that its dispatchers went over the route plan with its drivers, including Demarcus.

48. As a result of SWIFT's failure to train its drivers and implement adequate policies and procedures, SWIFT and its drivers were convicted of numerous violations of the FMCSR, including those referenced above in Paragraph 11.

49. On or about December 11, 2021, Demarcus was operating a tractor trailer for SWIFT in New Braunfels, Comal County, Texas.

50. The December 11, 2021, trip was Demarcus' first solo load in a tractor-trailer.

51. Due to SWIFT's inadequate training and qualification of Demarcus, combined with SWIFT's dispatcher's failure to plan the route, Demarcus missed his turn.

52. Demarcus chose to make an unprotected u-turn on the Loop 337.

53. Due to SWIFT's inadequate training and qualification, Demarcus did not know that it was dangerous and forbidden to make an unprotected u-turn in a tractor-trailer.

54. Due to SWIFT's inadequate training and qualification, Demarcus did not fully appreciate the danger of making a left turn or u-turn when there is an oncoming vehicle that would have to stop or swerve to avoid a collision.

55. Due to SWIFT's inadequate training and qualification, Demarcus did not know that he should never make a left turn or u-turn when there is an oncoming vehicle that would have to stop or swerve to avoid a collision.

56. Due to SWIFT's inadequate training and qualification, Demarcus failed to scan the road ahead, see oncoming vehicles and other potential hazards, and to avoid turning in front of oncoming vehicles if doing so will require the other vehicle to swerve or brake to avoid a collision

57. Demarcus was driving on Loop 337 and he attempted to make an unprotected U-Turn.

58. Plaintiff, Adriana De Leon, was approaching from the opposite direction on Loop 337.

59. Adriana De Leon was visible to Demarcus, yet he turned in front of her.

60. Adriana De Leon had the right of way.

61. Demarcus failed to yield the right of way to oncoming traffic.

62. The tractor trailer that Demarcus was operating for SWIFT collided with Plaintiff, Adriana De Leon.

63. Adriana De Leon did not have sufficient time to perceive the tractor-trailer turning in front of her, react to Demarcus' action, and avoid the crash.

64. Pleading in the alternative, if Demarcus did know that it was dangerous to make a left turn or u-turn when there is an oncoming vehicle that would have to stop or swerve to avoid a collision, then he acted with conscious indifference to the rights, safety, and welfare of Adriana De Leon when he made the unprotected u-turn on December 11, 2021.

65. Pleading in the alternative, if Demarcus knew dangerous to make an unprotected u-turn on a public roadway, then he acted with conscious indifference to the rights, safety, and welfare of Adriana De Leon when he made the unprotected u-turn on December 11, 2021.

66. The crash caused Plaintiff severe and permanent bodily injuries. These injuries resulted in the amputation of one leg and severe degloving injuries to her arm.

67. The manner in which the collision occurred (an unsafe U-turn that failed to yield right-of-way) is consistent with fatigue, violations of the hours-of-service regulations, and

distracted driving.

68. Upon information and belief, Demarcus was distracted, fatigued, and/or operating the vehiclein violation of the hours-of-service regulations set out in Part 395 of the FMCSR.

69. Had SWIFT trained Demarcus on the dangers of driving while fatigued, the hours-of-service rules, and the hazards of distracted driving, the crash would not have occurred.

70. Had SWIFT implemented policies and procedures to monitor and audit drivers' hours-of-service, it would have caught Demarcus' unsafe driving practices. SWIFT then could have taken remedial action that would have prevented this crash.

71. Defendants are jointly responsible for the safe operation of the tractor-trailer at issue.

72. Adriana De Leon was employed as a Comal County Sheriff's Deputy. She was off duty at the time of the collision.

## IV. CAUSES OF ACTION

### NEGLIGENCE OF DEFENDANT DEMARCUS

73. Plaintiff hereby incorporates paragraphs 6-72 as if fully set forth herein.

74. Demarcus had a duty to exercise the degree of care that a reasonably careful person would use to avoid harm to others under circumstances like those described herein.

75. Plaintiff's damages were proximately caused by Demarcus' breach and negligent disregard of said duty. The breach and negligent disregard of the duty consisted of, but is not limited to, the following acts and omissions:

   A. Operating a vehicle in careless manner and/or in violation of the Texas Transportation Code;

   B. Failing to yield the right of way to on-coming traffic;

   C. Failing to keep a proper lookout for Plaintiffs' safety that would have been maintained by a person of ordinary prudence under the same or similar circumstances;

D. Failing to maintain a clear and reasonable distance between SWIFT's tractor trailer and other traffic on the roadway, including Plaintiffs' motor vehicle;

E. Making an improper and unsafe U-turn;

F. Failing to control the operation of his vehicle;

G. Failing to avoid the crash in question;

H. Failing to operate his vehicle in a safe and prudent manner;

I. Failing to keep a proper lookout for other vehicles using the roadway;

J. Driver inattention;

K. Violating the terms and provisions of Texas Transportation Code, the Texas Driver's Handbook, and the Texas Commercial Motor Vehicle Drivers' Handbook;

L. Driving while fatigued in violation of FMCSR 392.3;

M. Driving in violation of the hours-of-service regulations set out in part 395 of the FMCSR;

N. Driving while distracted;

O. Failing to properly plan his route;

P. Failing to pay proper attention and missing his turn;

Q. Other acts of negligence and/or negligence *per se*; and

R. Any other acts of negligence discovered and to be shown at the time of trial.

76. Each of the foregoing acts and omissions, whether taken singularly or in combination, constituted a breach of Demarcus' duty and was a proximate cause of the collision made the basis of this cause of action and the injuries and damages suffered by Plaintiff.

77. The damages that Plaintiff was caused are the types of harm that the above statutes are intended to prevent. Plaintiff is a member of the class of people these statutes were enacted to protect. Such violations of statutes, as identified herein amount to negligence *per se* and are a proximate cause of the occurrence in question.

78. Defendant Demarcus knew that his conduct (including driving while fatigued, violating the hours-of-service regulations, and/or distracted driving) would naturally and probably result in injury or damage. Nevertheless, Demarcus continued the conduct with malice or in reckless disregard of the consequences, from which malice may be inferred. Thus, Demarcus is liable for punitive damages.

## NEGLIGENCE OF DEFENDANT SWIFT

### (Vicarious Liability)

79. Plaintiff incorporates paragraphs 6-78 as if fully set forth herein.

80. At all times material hereto, Demarcus was in the course and scope of his employment for SWIFT.

81. Because Demarcus was acting in the course and scope of employment with SWIFT when the crash occurred, SWIFT is vicariously liable to Plaintiff under the doctrine of *respondeat superior* and/or the statutory employment doctrine.

### (Direct Liability)

82. SWIFT was negligent in hiring and/or qualifying Demarcus to operate its tractor trailer. This negligence was a proximate cause of the crash and Plaintiff's damages.

83. SWIFT was negligent in failing to monitor, train, educate, direct, set policy, or give guidance to its drivers, including Demarcus, regarding:

   A.  The safe operation of commercial motor vehicles;

B. Distracted driving;

C. Fatigue (including the dangers of fatigue, recognizing fatigue, and avoiding fatigue);

D. The hours-of-service rules set out in Part 395 of the Federal Motor Carrier Safety Regulations;

E. The dangers of unprotected u-turns;

F. That tractor-trailer drivers should never make unprotected u-turns;

G. Seeing and hazard perception;

H. Never turning in front of an oncoming vehicle if the oncoming vehicle would have to brake or swerve to avoid a collision;

I. Route planning; and

J. The necessity of going over the route plan with the dispatcher.

84. SWIFT certified to the FMCSA in writing and under oath, that it had a system for qualifying drivers. SWIFT violated this promise when it failed to properly qualify and/or hire Demarcus. This negligence was a proximate cause of Plaintiff's injuries and damages.

85. SWIFT certified to the FMCSA in writing and under oath, that it had a driver training program when it applied to operate commercial motor vehicles in the United States. SWIFT violated this promise when it failed to train Demarcus. This negligence was a proximate cause of Plaintiff's injuries and damages.

86. The FMCSA has provided guidance on what actions motor carriers must take to assure safe operations and compliance with the FMCSR. This guidance includes the CSA Safety Management Cycle, a document made available to SWIFT and other motor carriers in the United States. The CSA Safety Management Cycle discusses the necessity for policies, procedures, training, communication, monitoring, and meaningful action by motor carriers

like SWIFT. SWIFT negligently failed to implement the FMCSA's guidance, as evidenced by its multiple violations and this crash.

87. The FMCSR also require training. FMCSR 390.3(e)(2) requires, "Every driver and employee involved in motor carrier operations shall be instructed regarding, and shall comply with, all applicable regulations contained in this subchapter." FMCSR 392.1(a) requires, "Every motor carrier, its officers, agents, representatives, and employees responsible for the management, maintenance, operation, or driving of commercial motor vehicles, or the hiring, supervising, training, assigning, or dispatching of drivers, shall be instructed in and comply with the rules in this part." SWIFT was negligent and negligent *per se* in failing to train its drivers, including Demarcus, in violation of FMCSR 390.3(e)(2) and 392.1(a). Upon information and belief, SWIFT was negligent in:

   A. Failing to establish and enforce policies and procedures regarding unsafe driving and the hours-of-service regulations;

   B. Failing to audit drivers' logs, supporting documents, and hours-of-service;

   C. Permitting violations of the FMCSR, including but not limited to the hours-of-service regulations set out in Part 395;

   D. Aiding and abetting violations of the hours-of-service regulations set out in Part 395 of the FMCSR;

   E. Failing to establish and enforce policies and procedures necessary to ensure driving safety, including policies p prohibiting unprotected u-turns and policies prohibiting turning in front of an oncoming vehicle doing so would require the oncoming vehicle to brake or swerve to avoid a collision, and;

   F. Failing to take action to remedy the problems with its safety management systems (including training, policies, and procedures) after receiving multiple alerts from the

FMCSA SMS system, and communications from the FMCSA regarding the safety issues at the company.

88. SWIFT was also negligent in its hiring and/or qualification of Demarcus to operate a commercial motor vehicle in the United States.

89. SWIFT had a duty dictated by the FMCSR to hire only qualified drivers to operate its tractor trailers.

90. SWIFT breached its duty to hire only qualified drivers to operate its tractor trailers. In particular, Demarcus' lack of experience, training, and education revealed him to be a dangerous driver for the purposes of operating commercial motor vehicles.

91. SWIFT's negligent qualification and/or hiring of Demarcus to operate a commercial motor vehicle was a proximate cause of injuries to Plaintiff.

92. Each of the acts and omissions set out in the preceding paragraphs were direct and proximate causes of the collision and Plaintiff's damages.

**(Gross Negligence)**

93. SWIFT knew that its acts and omissions would naturally and probably result in extreme harm, including injury and damages to others. Nevertheless, SWIFT continued the conduct with malice or in reckless disregard of the consequences, from which recklessness and/or malice may be inferred. Thus, SWIFT is liable for punitive damages.

**V. DAMAGES**

94. As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff was caused bodily injuries and incurred the following damages:

   G. Past medical expenses;

   H. Future medical expenses;

I. Physical pain in the past;

J. Physical pain that, in all reasonable probability, she will experience in the future;

K. Physical impairment in the past;

L. Physical impairment that, in all reasonable probability, will be endured in the future;

M. Disfigurement in the past;

N. Disfigurement that, in all reasonable probability, she will experience in the future;

O. Mental anguish in the past;

P. Mental anguish that, in all reasonable probability, she will experience in the future;

Q. Loss of earning capacity in the past;

R. Loss of earning capacity that, in all reasonable probability, will be incurred in the future; and

S. Punitive damages.

## VI. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that upon a final hearing of this action, judgment will be entered for the Plaintiff and against Defendants, jointly and severally, for damages in an amount exceeding the jurisdictional minimum of the Court, together with punitive damages, pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by law, post-judgment interest at the legal rate, costs of court, and such other and further relief to which Plaintiff may find herself entitled at law or in equity.

Respectfully submitted,

*/s/ Michael R. Cowen*
Michael R. Cowen
Bar No. 00795306
Sonia M. Rodriguez
Bar No. 24008466
COWEN | RODRIGUEZ | PEACOCK, P.C.
6243 IH-10 West, Suite 801
San Antonio, Texas 78201
Telephone: (210) 941-1301
Facsimile: (210) 579-8968
E-Mail for Service:
efilings@cowenlaw.com

James Bettersworth
Bar No. 24005342
THE BETTERSWORTH LAW FIRM
110 W. Faust Street
New Braunfels, Texas 78130
Telephone: (830) 606-0404
Facsimile: (830) 626-1414
E-Mail for Service:
james@bettersworthlaw.com

**COUNSEL FOR PLAINTIFF,
ADRIANA DE LEON**

PLAINTIFF DEMANDS TRIAL BY JURY